UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
LEWIS HELFER, JENNIFER ELSTER-
HELFER, AND COLLEEN HELFER,

               Plaintiffs,

        - against –

JPMORGAN CHASE BANK, N.A.,

               Defendant.

------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 0008 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiffs Lewis Helfer ("Lewis"), Jennifer Elster-Helfer ("Jennifer") and Colleen Helfer ("Colleen") brought a suit against defendant JPMorgan Chase Bank, N.A. ("Chase") for negligence, breach of contract, breach of bailment, breach of fiduciary duty, and conversion, arising out of allegations that approximately $250,000 in cash went missing from plaintiffs' safe deposit box. Chase now moves for summary judgment on the grounds that plaintiffs' breach of prohibitions set forth in their safe deposit box lease preclude recovery of the alleged lost cash, and that plaintiffs have failed to identify admissible evidence to support their case that plaintiffs left the $250,000 in cash in their safe deposit box. For the following reasons, defendant's motion is granted.

**BACKGROUND**

At the outset, the Court summarizes the facts relevant to this motion as drawn from materials submitted by the parties in connection with this motion.[1]

**1. Plaintiffs Lease the SDB**

On or around April 13, 2001, Lewis, along with his wife, Jennifer and mother, Colleen, jointly executed a Lease of Safe Deposit Box Agreement (the "Lease") for safe deposit box number 290 (the "SDB") located at the Gateway Plaza Chase Bank branch (the "Gateway Plaza Branch"), located at 331-337 South End Avenue, New York, N.Y.  Chase designated Lewis Helfer as the primary joint

---

[1]     The following facts are drawn from Chase's Local Civil Rule 56.1 Statement of Undisputed Material Facts (ECF No. 43); the Declaration of Tyler Kandel in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 39); the Declaration of Geoffrey Andrews in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 40); the Declaration of Tracalene Ruiz in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 41); the Declaration of Peterson Chow in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 42); the Declaration of Tyler Kandel in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 48); the Declaration of Joseph Sullivan in Opposition of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 52); the Declaration of Plaintiff Lewis Helfer in Opposition of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 53); the Declaration of Geoffrey Andrews in Support of Chase's Motion for Summary Judgment (ECF No. 59); the Declaration of James J. Stroud in Support of Chase's Motion for Summary Judgment (ECF No. 60); and the Declaration of Tyler Kandel in Support of Chase's Motion for Summary Judgment and the exhibits annexed thereto (ECF No. 61).

account holder, though in placing his social security number on record, it listed a number ending in 3876 when Lewis's actual social security number ends in 3826.

When Chase leased the SDB to plaintiffs, they linked the SDB to a checking account belonging to Colleen to be used for automatic payments of fees associated with the Lease.

At the time plaintiffs leased the SDB, Lewis and Jennifer resided at 355 South End Avenue, Apt 34P, New York, NY (the "South End Apartment"). Chase's documents noted this address, including the apartment number for Jennifer, but did not note the apartment number in Lewis's address. When plaintiffs entered into the Lease, Colleen lived in Apartment 10B of the same building.

The Lease provides that:

> Lessee agrees to store in the Safe only jewelry, securities and papers. Lessee agrees NOT to store any other property in the Safe including, without limitations, money (cash and coin (except for those of numismatic value)), whether or not legal tender, bullion and postage stamps.

Despite this provision, Lewis testified that around the time plaintiffs began leasing the SDB, he had moved a black, zippered case or envelope (the "Black Case") containing $250,000 comprised of $100 bills from an earlier safe deposit box at the Gateway Plaza Branch. The origins of this Black Case are somewhat murky. Lewis

-3-

testified that sometime in the eighties and nineties he accumulated around four-hundred to five-hundred thousand dollars in cash in a security deposit box at a World Trade Center branch of Chase.  At some point, Lewis segregated $250,000 to keep separately in the Black Case.  When the Gateway Plaza branch opened closer to his home, he closed the World Trade Center Branch box and claims he then moved the Black Case to a safe deposit box at the Gateway Plaza Branch that he opened prior to opening the SDB.  This happened "probably in the nineties."  Jessica testified that she saw the Black Case in this earlier safe deposit box and that it was open and "stuffed" with cash in a "kind of messy" fashion.  She testified that Lewis wanted her to be aware that there were "hundreds of thousands of dollars" in the box.  Finally, Lewis testified that at some point, he re-counted the amount of money in the Black Case and sealed it shut with masking tape.  He then moved it into the SDB around April of 2001 when plaintiffs opened the SDB.  Jennifer testified that she saw the sealed Black Case in the SDB.  Colleen also testified that see saw the sealed Black Case in the SDB and that Lewis at some unknown point told her he had "a quarter of a million dollars" in the Black Case.

After September 11, 2001, Colleen relocated with her husband to Florida.  She testified that she notified Chase to change her

address to 3700 South Ocean Boulevard, and that in 2010, this address was associated with her bank account ending in 2367 which was drawn from to make payments for the SDB.  In 2004, Lewis moved from the South End Apartment to 75 Leonard Street.  He rented out the South End Apartment to an Elizabeth Alexander.  Lewis testified that he went to the Chase Gateway Branch on two occasions to instruct Chase to change the address on all his accounts to 75 Leonard Street.

According the Chase's records, between April 2001 and August 2011, the only individual to access the SDB was Colleen who did so on nine separate occasions.  Lewis testified that he too accessed the SDB but Chase did not require him to sign in as they knew who he was.

### 2. The Amended Lease

The Lease has a provision by which Chase may modify the Lease "by a writing mailed by the bank to you or posted in the branch where the safe is located."  Chase purports to have amended the Lease, effective as of April 2018 (the "Amended Lease"). Plaintiffs assert, however, that they never saw the Amended Lease, and that if Chase had mailed it, it would have sent the Amended Lease to the wrong addresses as each of the plaintiffs had moved.

The Amended Lease provides that the lessee "agree[s] not to

-5-

use the box to store money, coin or currency unless it is of a collectable nature, and you assume all risks and hold the Bank harmless of any loss or alleged loss of said money, coin or currency."

**3. Defendant Sends Notices of Incomplete Payments**

The Lease and Amended Lease contain different termination clauses.  The Lease provides that Chase "may terminate this lease and require vacation and surrender of the Safe and the keys and combinations thereof at any time by giving thirty days' written notice of such termination, to be sent by mail to the Lessee, addressed to the last address of the Lessee(s) shown on the Safe Deposit Box Contract Card."

Per the Amended Lease:

> [Chase] may terminate this lease at any time by telling you verbally or mailing you written notice at the address that we have on file. Once notified you will remove the contents of the box, surrender all keys and pay all the fees due. If you have not removed the contents and/or have not returned all keys on the date of termination of the lease, or if the annual rent has not been paid, we will, after observing the time prescribed by applicable law and/or regulation, gain access to the box and remove, list and store its contents as required by state law.

On April 21, 2017, Chase sent Lewis an invoice stating that his "annual safe deposit box rent . . . is due April 15, 2017."

-6-

This invoice was sent to the South End Apartment address. For reasons which neither party explains, this was contrary to Chase's practice to debit the annual payment from Colleen's account, as Chase had done so since 2001.  On May 19, 2017, Chase sent a follow-up letter, again to the South End Apartment address.  At the same time, Chase also sent a letter to Colleen at her South End Avenue address.  On August 21, 2017, Chase mailed additional letters addressed to Lewis and Colleen's South End Avenue addresses.

On February 22, 2018, Chase sent a follow-up invoice stating: "We've tried to reach you about your annual safe deposit payment, which is 313 days past due. You must immediately pay the balance due on this notice to avoid your box being opened and your contents transferred to an offsite location.  As with the other notices, this was sent to the South End Apartment address.

**4. Defendant Drills the SDB and Removes its Contents**

Having received no payment or responses from any of the plaintiffs, on April 18, 2018, Chase had two of its safe deposit box analysts, Lori Hartwell and Nancy Scipio[2] (the "Analysts")

---

[2]     Plaintiffs allude to certain personal financial difficulties Ms. Scipio may have experienced in years past.  Because they are irrelevant to our analysis, the Court declines to repeat those allusions here.

drill the SDB open, inventory the contents, and place those contents in separate bags for storage.  That same day, Chase mailed Lewis a letter stating that the contents of the SDB had been drilled and would be moved to an off-site location.  Lewis testified that even though he was no longer living at the South End Apartment address, a doorman for the building recognized his name and gave the letter to Ms. Alexander who called Lewis to notify him of the delivery.  Lewis testified that he received the letter on April 20, 2018.

Lewis then contacted Chase by telephone several times to discuss reclaiming the contents of the SDB.  On May 2, 2018, Lewis and Jennifer visited the Gateway Plaza Branch to reclaim the contents of the SDB.  Among their personal belongings, they recovered $75,580.  Of this amount, forty-six hundred-dollar bills were recovered from the Black Case which the Analysts initially described as "empty" in their inventory.  Separately, two additional bags contained 250 hundred-dollar bills each.  Lewis, who recorded a video of himself at the Gateway Plaza Branch, confronted Dahiana Frias, the branch manager, clearly in a state of distress indicating that the cash in the bags were well short of the amount he had placed in the SDB.  Lewis also asked to see a video of the drilling, and Ms. Frias stated that a video existed

but that she would have to involve corporate security to retrieve it.  No video was produced to plaintiffs, and according to Chase's technical security manager, any such video would not have been preserved after ninety days in the absence of a legal hold. However, prior to the commencement of the action none of the plaintiffs formally notified Chase that any of their property or cash was missing when they reclaimed the contents of the SDB and no police report was filed.

### 5. The Exculpatory Clauses

The Lease and Amended Lease both contain exculpatory clauses but with differing language.  The Lease provides that:

> [Chase] shall have no liability to Lessee for the alleged loss of or damage to the contents or alleged contents of the Safe due to fire, water, other mishap, robbery or burglary provided [Chase] has exercised ordinary care. "Ordinary care" means the implementation by [Chase] [of] access procedures and the use of security precautions deemed by [Chase] to be reasonable and appropriate to safeguard of property.  Lessee agrees that loss, or destruction of, or failure to return, any part or all of the alleged contents of the Safe, including a "mysterious disappearance," shall not itself establish, or support and inference of, or failure to exercise ordinary care.

The Amended Lease provides that:

> This lease does not create a bailor and bailee relationship between you and [Chase]. We do not have knowledge of and we do not exercise supervision over the box, or over examination

or removal of any of its contents. You assume all risks of injury, loss or damage of any kind (included but not limited to loss or damage due to fire, water, other mishap, robbery or burglary) arising out of the deposit of anything in the box, provided we have exercised ordinary care. "Ordinary care" means the implementation by [Chase] [of] access procedures and the use of security precautions deemed by [Chase] to be reasonable and appropriate to safeguard of property. The fact that any contents may be missing will neither imply that unauthorized access has been granted nor used as evidence of lack of ordinary care or negligence on our part. * * * * [CHASE] WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, CONSEQUENTIAL OR EMOTIONAL DAMAGES REGARDLESS OF THE FORM OF ACTION. YOU AGREE AND REPRESENT THAT THE AGGREGATE VALUE OF THE CONTENTS OF THE BOX WILL NOT EXCEED $25,000 AT ANY TIME AND BASED ON THIS REPRESENTATION FURTHER ACKNOWLEDGE AND AGREE THAT [CHASE]'S MAXIMUM LIABILITY, IF ANY, WILL BE LIMITED TO $25,000 WITH RESPECT TO ANY CLAIM ARISING OUT OF, OR OTHERWISE CONNECTED WITH, THIS AGREEMENT, THE BOX OR ITEMS STORED IN THE BOX.

## 6. Procedural History

Plaintiffs commenced this action on November 16, 2018 in New York Supreme Court and Chase removed to this Court on January 2, 2019. ECF No. 1. On December 12, 2019, Chase filed a pre-motion letter seeking leave to file a motion for summary judgment. ECF No. 33. Plaintiffs responded to Chase's letter (ECF No. 36), and after reviewing the letters and the amended complaint, this Court granted Chase leave to file its contemplated motion at a conference on January 15, 2020, which it did on April 22, 2020. ECF No. 38.

**DISCUSSION**

**1. Legal Standard**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted) (quoting Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)). A factual dispute is genuine if a reasonable factfinder could decide in the nonmoving party's favor. Id.

At summary judgment, a court must resolve all ambiguities and draw all justifiable inferences in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The moving party must "make a prima facie showing that it is entitled to summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). If it does so, then there is no issue for trial unless the party opposing summary judgment presents "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

**2. Analysis**

Chase makes two overarching arguments in their motion for

summary judgment that would dispose of plaintiffs' claims in their entirety.  The first is that plaintiffs cannot hold Chase liable for cash missing from the SDB because the Lease prohibited plaintiffs from storing cash in the SDB in the first place.  ECF No. 44 at 12-13.  Second, Chase argues that plaintiffs' self-serving deposition testimony absent credible corroborating evidence is insufficient to establish damages.  Id. at 19-21. Additionally, Chase makes discrete arguments to support the dismissal of plaintiffs' negligence, breach of contract, breach of bailment, breach of fiduciary duty, and conversion claims.  Id. at 13-21.

Plaintiffs, in response, use twenty of their twenty-five pages to list the various ways in which Chase made administrative errors maintaining plaintiffs' personal details linked to the SDB account and processing payments for the SDB.  ECF No. 55 at 2-20. These errors, so plaintiffs' argument goes, amounted to breaches of contract under the Lease which resulted in the improper drilling of the SDB, which in turn led to the alleged theft of plaintiffs' cash.  In response to the suggestion that they themselves have breached the Lease by storing cash in the SDB, plaintiffs unveil a new theory that they stored the cash in the SDB for numismatic purposes which would be allowed under the terms of the Lease.

Secondly, plaintiffs argue that Lewis's testimony regarding the $250,000 stored in the Black Case, combined with testimony from Jennifer that she had seen the Black Case stuffed with cash and Colleen's testimony that Lewis had, at some previous point in time, told her he kept "a quarter of a million dollars" in the Black Case, is sufficient evidence to establish damages.

Lastly, plaintiffs consent to the dismissal of their negligence and bailment claims.   ECF No. 55 at 25.   The Court therefore grants dismissal of those claims.

At no point in their opposition brief do plaintiffs attempt to sustain their breach of fiduciary duty claim or claim for punitive damages.   The Court therefore will dismiss those claims as waived.   See In re UBS AG Secs. Litig., Case No. 07-cv-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (recognizing that a party "concedes through silence" arguments by its opponent that it fails to address).[3]

Thus, only plaintiffs' breach of contract and conversion claims remain.   Because plaintiffs breached the Lease by storing

---

[3]   Even were it not waived, plaintiffs' claim for breach of fiduciary duty would fail on account that plaintiffs have not identified any duty of Chase's independent of its contractual obligations.   See Grund v. Delaware Charter Guarantee & Tr. Co., 788 F. Supp. 2d 226, 249 (S.D.N.Y. 2011) ("[U]nder New York law, a cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand.").

currency in the SDB, those claims must likewise be dismissed.

Under the terms of the Lease, plaintiffs "agree[d] NOT to store any other property in the Safe including, without limitations, money (cash and coin (except for those of numismatic value)), whether or not legal tender, bullion and postage stamps." Similarly, in the Amended Lease, the lessee "agree[s] not to use the box to store money, coin or currency unless it is of a collectable nature, and you assume all risks and hold the [Chase] harmless of any loss or alleged loss of said money, coin or currency."  We need not reach the question of whether the Lease was effectively amended.  The result under either the Lease or the Amended Lease is the same:  plaintiffs cannot sustain their case.

New York courts have routinely upheld safe deposit box lease provisions that prohibit the storage of currency.  See, e.g., Radelman v. Mfrs. Hanover Trust Co., 306 N.Y.S.2d 638 (N.Y. App. Div. 1969) ("[T]he lease provision prohibiting the deposit of money in the box is neither unconscionable nor offensive to public policy which imposes no limitation or restriction on the freedom of contract between a bank and its depositors. . . . Plaintiff, having executed the lease, is, in the absence of fraud or undue influence, conclusively bound by the terms therein.").  Under these provisions, courts have consistently dismissed plaintiffs' claims

arising from allegations of missing or stolen cash from safe deposit boxes.  See Uribe v. Merchants Bank, 91 N.Y.2d 336 (1998) (dismissing claims arising from alleged theft for items not specifically allowed for storage under the safe deposit box lease); Levina v. Citibank, N.A., 16 A.D.3d 160 (N.Y. App. Div. 2005) (dismissing action for loss or theft of cash on grounds that plaintiff was prohibited from storing cash in safe deposit box); Martin v. Citibank, N.A., 2008 N.Y. Misc. LEXIS 9631, 2008 NY Slip Op 33398(U) (N.Y. Sup. Ct. Dec. 15, 2008) (granting partial summary judgment for breach of contract and negligence claims as to the alleged theft of cash from a safe deposit box where lease prohibited storage of cash); Rodriguez v Banco Popular N. Am., 2014 N.Y. Misc. LEXIS 3417, 2014 NY Slip Op 32003(U) (N.Y. Sup. Ct. June 10, 2014) (dismissing claims, including for breach of contract and conversion, where safe deposit box lease prohibited plaintiff from storing money).  Here too, we must dismiss plaintiffs' claims arising from the alleged theft of $250,000 in cash from the SDB since plaintiffs were prohibited from storing cash therein in the first place.

Chase's alleged missteps leading up to the drilling of the SDB – namely the unexplained halting of automatic payments from Colleen's account and the failure to update plaintiffs home

addresses – do not change our analysis.  For instance, in Martin
v. Citibank, N.A., the court held that there was indeed a triable
issue of fact over whether the lessor bank permitted unauthorized
access to plaintiff's safe deposit box.  2008 N.Y. Misc. LEXIS
9631, at *9.  Nonetheless, it still dismissed plaintiff's claim
for damages arising out of missing cash because the lease in issue
prohibited storage of cash.  Id. at *5.[4]

Plaintiffs' argument that they did not breach the terms of
the Lease because the missing $250,000 had numismatic value –
raised for the first time in their opposition to Chase's motion
for summary judgment – borders on risible.  Lewis now claims in a
declaration submitted with plaintiffs' opposition brief that the
$250,000 was comprised of "2,500 mint condition, brand new $100
bills in consecutively numbered batches." ECF No. 53 ¶ 4.  He then
attaches a print-out of sales on Ebay purporting to show lots of

---

[4]    Plaintiffs' reliance on New York Banking Law § 335 similarly fails.
The law governs a bank's remedies to dispose of property when a safe
deposit box lease is terminated.  It would provide a bank with a defense
against claims of lost property arising from the removal of a plaintiff's
safe deposit box when the bank complies with the requirements of the
statute.  See Fouad v. Citibank, N.A., 553 N.Y.S.2d 577, 578-80 (N.Y.
Sup. Ct. 1989); Golomb v. N. Fork Bank, 824 N.Y.S.2d 754 (N.Y. Dist. Ct.
2006).  But plaintiffs have not pointed the Court to, nor has the Court
by its own research found, any case law suggesting that Banking Law § 335
creates a private cause of action for plaintiffs or otherwise adds
obligations on the part of a bank to safeguard property for which it is
not liable under the terms of the Lease.  Thus, Chase's alleged non-
compliance with the letter of Banking Law § 335 does not alter the
Court's conclusion that plaintiffs' claims must be dismissed.

1985 100-dollar-bills selling at premiums.

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).[5] Lewis's deposition testimony gives no indication that he gave any thought to the bills placed in the SDB or into the Black Case specifically. He testified that the did not deposit the $250,000 at a single point but rather made several deposits "over time." According to his deposition testimony:

> [T]he money was put in the box and then it was eventually made a package of [$250,000]. I didn't go from ['L]et me take out ten thousand I'm going to put in the bag.['] I had more than two fifty in that box but I don't know exactly when I accumulated it to make the two fifty package.

Additionally, he admitted in his deposition that when he received these new bills from the bank, not all of it went into storage. The cash that went into the security deposit boxes "fluctuated." Lewis notes that he "would keep some [and] spend some," and when asked whether there was any way to trace the money in the SDB,

---

[5]  See also Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 363 n. 9 (S.D.N.Y. 2011) (declining to consider facts raised for the first time in opposition papers).

admitted that he hadn't written the number down on each bill he was placing in the SDB and merely "assume[d] . . . that I took out all that money . . . in the eighties" because the dollars he found remaining in the Black Case were from 1985.

Now, suddenly, Lewis declares with certainty under penalty of perjury that he counted the money in the Black Case which "consist[ed] of "2,500 mint condition, brand new $100 bills in consecutively numbered batches." This assertion lacks all indicia of credibility and is inconsistent with his deposition testimony that he would spend some dollars while placing others in the SDB and that he was unable to answer defense counsel's question of how he could track the money allegedly placed in the SDB. This is precisely the type of sham factual issue that courts in this Circuit will not countenance to save a case from summary judgment.

Further, at no point prior to his late declaration did Lewis express any inkling that he had interest in the missing dollars for their collector's value. In fact, in response to the direct question of "[w]hy did you deposit . . . that two hundred and fifty thousand dollars into that case into that box," Lewis replied:

> I had a lot of money I was making and I wanted
> to feel I wouldn't keep it all in one place.
> Just spread it around.  Just felt in case I
> needed it I had the cash in there.  I just
> don't feel comfortable having my money . . .
> all in one place.[6]

Beyond Lewis' testimony, the state of the bills in the Black Case also belies the claim that they were held for their numismatic value.  Jennifer describes how they were "stuffed" into the case in "messy" fashion.  As mentioned above, Lewis also kept no record of the details of the dollar bills in the Black Case, further undermining the theory that he had any intention to maintain the bills as collectors' pieces.  Cf. DeBiase v. Commercial Union Ins. Co. of New York, 278 N.Y.S.2d 145, 148 (N.Y. Civ. Ct.), aff'd sub nom. De Biase v. Commercial Union Ins. Co. of New York, 286 N.Y.S.2d 502 (N.Y. App. Term 1967) (distinguishing between monies kept as articles of exchange and monies that are "removed from circulation as a medium of exchange and collected and saved by a numismatist concerned with their commercial numismatic value").

Lastly, in answers to interrogatories and in the complaint

---

[6]    Jennifer and Colleen's testimony likewise do not suggest any numismatic purpose for the money held in the SDB.  According to their testimony, Lewis only told his wife and mother about the cash in the SDB so that "in case something happen[ed] to [him, he wanted them] to know it is there."  No mention was made of the fact that they might receive a windfall from the collectable value of the currency.

itself, plaintiffs never referenced the value of the missing money beyond its alleged $250,000 in face value.  Even in its letter in response to Chase's letter requesting a promotion conference (ECF No. 36) and when the parties came before this Court to discuss the motion, plaintiffs failed to even mention this argument in response to the Chase's theory of the case.  It is clear that Lewis's newly minted passion for numismatics is a last-ditch attempt to save plaintiffs from the clear result of New York law.  It fails.  No reasonable jury could credit what in the Court's view approaches, if not constitutes, perjury.

Because plaintiffs' breach of the Lease prevents them from recovering any missing cash from the SDB, and thus requires dismissal of their remaining claims, the Court need not reach Chase's secondary argument concerning the sufficiency of plaintiffs' evidence to prove damages.

## CONCLUSION

For the foregoing reasons, Chase's motion for summary judgment is GRANTED in its entirety.[7]  The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 38 and to close the case.

---

[7]    As Chase was the only party to request oral argument and as it has prevailed on its motion, the Court concludes that oral argument would not be productive.

**SO ORDERED.**

Dated:      New York, New York
            November 20, 2020

_____
    NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE